### ALLEN *v.* KILLINGER.

1. To admit the declarations of a third person in evidence, on the ground that one party to the suit had referred the other party to him, it is necessary that the reference should be for information relating to the matters in issue.

2. A conversation between the plaintiff and such third party, in regard to a contract of the plaintiff with the defendant, cannot be given in evidence when the reference by the defendant to such party was not for information concerning such contract.

3. The plaintiff's statements, in such conversation, concerning the terms of the contract, are not evidence in his favor, especially, since he can give his own version of the contract as a witness, but under oath, and subject to cross-examination.

ERROR to the Circuit Court for the Northern District of Illinois. The case was this:

There were two firms of both which a certain B. F. Murphy was a member; the one was at Des Moines, and consisted of this B. F. Murphy and a certain Allen. This firm was under the title of Murphy & Allen. The other was at Chicago, and consisted of this same B. F. Murphy and one Miles Murphy. This firm was under the title of Miles Murphy & Co. The former was engaged in the business of *packing pork;* the latter in that of buying *and selling the* " *hog product*" on commission.

In this state of things, one Killinger, passing through Des Moines with a drove of hogs, and meeting with Allen, whom he had known before, entered into a contract of *some sort* about them with him, and the hogs, instead of being driven further, were killed and packed by the firm at Des Moines, and forwarded to the firm at Chicago, by whom they were sold. The Chicago firm, however, failed, soon after, and never paid the money, either to Killinger or to the Des

Moines firm.  Allen, however, still remained solvent.  In this state of facts, Killinger alleging that Allen was a member of the Chicago firm, and responsible for their acts, or, if he was not, that the firm of Murphy & Allen, at Des Moines, undertook, not only to slaughter and pack his hogs, but to sell them at Chicago, and account to him for the proceeds, now sued B. F. Murphy & Allen, as partners in trade, alleging, that he delivered to *them* at Des Moines, the hogs, which they agreed to slaughter and pack at that place, and forward to Chicago, and sell, on his account, and to pay to him the proceeds of the sale.  To this B. F. Murphy & Allen pleaded separately.  In one of his pleas, Allen said that he did not make the said promises, in partnership with said B. F. Murphy, but that, if any such were made, they were made by B. F. Murphy and others, composing the firm of Miles Murphy & Co., of which he was not a member.

B. F. Murphy filed a similar plea, saying, that if the promises were made by him at all, they were made as a member of the firm of Miles Murphy & Co., of which Allen was not a partner.

Upon the trial, the plaintiff, Killinger, Miles Murphy, who had failed, and Allen, who remained solvent, were all examined as witnesses.  On the examination of Miles Murphy —that witness having stated that he remembered the fact of the plaintiff, Killinger's, coming to him with reference to the hog product, when he was in Indiana, and their having a talk—the bill of exceptions disclosed, that the following questions, objections, promises, and proceedings took place :

*Question.*  State what conversation you had, and what you said to him.

(Question objected to by the defendant's counsel, on the ground that the conversation inquired about was incompetent as evidence, neither of the defendants being present.)

Plaintiff's counsel then stated as follows :

I shall expect to prove, by another witness, that Killinger was sent by B. F. Murphy to Miles Murphy, with reference to these hogs, and, therefore, I suppose the conversation is competent.

And, thereupon, the objection was overruled by the court, and the defendant excepted.

*Answer.* 1 will state the substance. He said he had come down to hunt his money; that he was out of money, and that he had placed some hogs in Allen's hands in Des Moines.

(Defendant here again objected to any conversation between plaintiff and witnesses, relating to defendant, Allen's, agreement or arrangement with the plaintiff, as incompetent evidence, being but hearsay; but the objection was overruled, and defendant excepted.)

*Question.* Did he say anything about B. F. Murphy's sending him?

*Answer.* I think B. F. Murphy, he said, had sent him down there.

*Question.* State what was said between you and him substantially.

(Defendants again objected, &c., but the objection was overruled by the court, and the defendants excepted.)

*Answer.* He said he had come from Des Moines, and saw B. F. Murphy there, and that B. F. Murphy refused to pay him or give · him any satisfaction, and he had sent him down to me, to see if he couldn't get his money out of me. I told him he had come to a bad place; the house had failed, and I didn't know anything about his matters. I knew he had some pork here; there had been some shipped in Des Moines. *He went on to tell me he had placed it in Mr. Allen's hands, and it was sent here, and he was out $8000 or $10,000;* I forget the amount. I told him he couldn't get it out of me; I didn't know anything about it; didn't know anything about the details of the business, whether B. F. Murphy had sold the meat, or anything about it.

Killinger, being subsequently examined, testified, that he urged B. F. Murphy, in Chicago, for money; that Murphy, apparently aiding his object, took him to Mr. Jewett, Allen's agent, saying, that some might be had of him; that going to Mr. Jewett's, Mr. Jewett, on hearing the purpose of the visit, said to Killinger, "Did you not ask me, when you were here in the winter, to deposit your money in the Fifth National Bank?" To this Killinger answered: "Yes, I did." Jewett then said, "That would leave Allen

out." To which Killinger replied: "Mr. Murphy, if that's all you wanted me to come here to answer, you need not have brought me here to commit myself. I don't deny, that if you let Allen out, the hogs are all gone up." The witness went on to state, that after this, B. F. Murphy urged him to go and see Miles Murphy, then in Indiana, and try and get money from him. The witness stated that he was very reluctant to go, not regarding Miles Murphy as having anything to do with the business, and who would say, at once, that he owed him, Killinger, nothing; but, still, on the urgency of B. F. Murphy, who told him that there was "nothing like trying," and who, finally, went to his hotel, and took him in his own carriage to the railway station, he did go.

This testimony of Killinger was the testimony relied on by the plaintiff's counsel to redeem his pledge to the court.

Verdict and judgment having been given for the plaintiff, the case was now here on error, the errors relied on being all presented by the bill of exceptions. Some objections were made to the charge, but this court having been of opinion that they were not tenable, and the judgment, as it will be seen in the sequel, having been reversed on another ground, for which reason the court thought it unnecessary to examine them, it is needless to present them.

*Mr. J. M. Jewett, for the plaintiff in error:*

No doubt the rule laid down by Greenleaf is a settled rule,* that "the admissions of a third person are also receivable in evidence against the party, who *has expressly referred another to him* for information in regard to an uncertain or disputed matter, and that in such cases, the party is bound by the declarations of the person referred to, in the same manner and to the same extent as if they were made by himself." But being an exception to a general rule, the party seeking to avail himself of it must bring himself strictly within its provisions, and, therefore, before the con-

---

* Law of Evidence, vol. i, § 182.

versations referred to could be admissible, as an admission of Miles Murphy, it should have been shown, that the parties against whom the admission was offered had expressly referred the party offering the evidence, to Miles Murphy for information. The evidence was offered generally, and against both defendants, who had pleaded separately. It was not preceded by any proof that the defendants *had expressly referred* Killinger to Miles Murphy for information upon any subject; but instead of such proof, the plaintiff's counsel stated, " that he expected to prove by another witness that Killinger was sent by B. F. Murphy to Miles Murphy, *with reference to them hogs.*"

The promise of the counsel here made was insufficient for two reasons:

1st. It does not contain any statement of an expectation to prove that Killinger was sent to the witness "*for information.*"

2d. It does not connect the defendant Allen, in any way, with the sending of Killinger to the witness.

*Messrs. Gookins and Roberts, contra:*

In answer to the objections raised, we say:

1. The testimony elicited amounts to nothing, and could have had no influence upon the verdict. Killinger told Miles Murphy " he had come to hunt his money." Murphy replied that " he had none for him." What does that amount to?

The principle of the rule on which we rely is this: when one refers to another for information, he accredits that other to speak for him, and in effect makes the information given his own. He speaks himself through the mouth of the person referred to. But this is an act. It is part of the *res gestæ.* Killinger was sent for money. What was said in doing the errand was part of the act itself. It characterizes the act, and this was very important. Killinger all the time insisted that Murphy & Allen, and not Miles Murphy & Co., were liable to him, and he for a long time refused to go to Miles Murphy, but consenting, if not willing, to try

all expedients, however unpromising, to get his money, he finally went. This act might have been turned against him, as Murphy & Allen were endeavoring to do, by showing that he had recognized Miles Murphy & Co. as his debtors instead of themselves, if he was not allowed to show what really did take place ; and the language used was much the most important part of the whole transaction, for the purpose of showing its true character.

The objection seems to be a criticism upon the statement of the plaintiff's counsel, as to how he would make the defendants answerable for this errand. He did not say he expected to prove Killinger was sent to the witness "for information."

2. It is objected that Allen is not shown to have had any hand in sending Killinger to the witness. It was not our expectation to make out our whole case by proof of this interview. It is unusual for all the partners of a firm to participate in every transaction which affects the firm, particularly when they reside in different States. No doubt there must be evidence enough in the case to show the joint liability, as one cannot make another his partner by his own statement. But suppose they both, at different times, make statements or do acts that show them to be partners, then all the acts and declarations of both are admissible.

It is true that Allen's connection with the business had not been shown when the witness testified. But when several distinct acts and declarations are relied on to show a partnership, all cannot be first in the order of proof; and if the party offering the evidence fails to adduce enough to submit the question to the jury, the opposing counsel may ask to have the evidence stricken out, which the counsel did not do, for he plainly saw that the evidence was abundant for this purpose.

Mr. Justice MILLER delivered the opinion of the court.

We are of opinion that the court erred in admitting, against the objection of the defendants, the conversation

between Miles Murphy and the plaintiff, in which the plaintiff gives his version of his contract with defendant, Allen.

The plaintiff Killinger had an opportunity to give his version of the contract made by Allen with him on behalf of Murphy & Allen, and he did so under oath, and subject to cross-examination. Miles Murphy was the plaintiff's witness, and under oath testified to what he knew. But in the examination of Miles Murphy by the plaintiff's counsel he was asked to detail a conversation which took place between himself and the plaintiff in Indiana, when neither of the defendants were present.

The witness stated, among other things, in answer to this request, that he (the witness) knew that the plaintiff had some pork in Chicago, that it had been shipped from Des Moines, and that the plaintiff went on to tell him that he had placed it in Mr. Allen's hands, and that it was sent to Chicago, and that he (the plaintiff) was out $8000 or $10,000.

When it is remembered that the only important issue before the jury was, whether Allen's contract with the plaintiff was merely to slaughter and pack for the plaintiff the seven hundred hogs, or whether he had undertaken to forward and sell at Chicago the product of the hogs after they had become converted into pork, the importance of this statement by the plaintiff is obvious. Slaughtering and packing hogs at Des Moines is one business, and buying and selling pork at Chicago, whether on commission or otherwise, is a very different business; and the plaintiff is here permitted to prove what he had told Mr. Murphy about that matter after the controversy had arisen, and when neither of the defendants were present to deny it, or to explain the matter.

It does not seem to us that the pledge made here by the plaintiff's counsel (who, when the testimony was objected to, apparently conceded that the question was improper as matters stood), was what was required to admit such testimony, if we suppose the pledge to have been fully redeemed. The rule invoked by the counsel is, that where one person is sent by another to a third party for information in reference to an uncertain or disputed matter, the person sending is

bound by the declarations of the party to whom he was referred, as if they were made by himself.

But, there is here no statement that the counsel expected to show that Killinger had been sent to Miles Murphy for information as to the extent of Killinger's contract with Allen, or even with Allen and B. F. Murphy, or with any reference to that contract. Such a supposition is absurd, as the plaintiff must have known all about that, while Miles Murphy could know very little. And so the declarations brought out by the conversation that are important are not the declarations of Miles Murphy in answer to a request for information; but they are the declarations of the plaintiff made to Murphy.

When the counsel came to fulfil this promise, it is equally clear that B. F. Murphy did not send the plaintiff to Miles Murphy for information, but for money. Killinger was urging B. F. Murphy, in Chicago, to pay him. The firm of Miles Murphy & Co. had failed, and to get rid of Killinger's personal importunities, B. F. Murphy urged him to go and see Miles Murphy, who was then in Indiana, and see if he would not pay him something. This is very clear from Killinger's own statement, being the one relied on by counsel to redeem the pledge to the court.

It seems to us that Killinger's statement to Miles Murphy was mere hearsay, made by the plaintiff in his own favor after the controversy had arisen, in the absence of defendants, and its introduction cannot be justified under the settled rules of evidence.

But if there ever could have been a justification for such testimony, there can surely be none now. For the plaintiff is permitted now to tell his own story to the jury directly, but under the sanction of an oath, and subject to the test of cross-examination. Shall he also be permitted to prove what he said to a third party about the same matter when he was under no oath, and in no danger of cross-question or contradiction?

For this error the judgment must be

REVERSED AND A NEW TRIAL AWARDED.

Mr. Justice NELSON, with whom concurred Mr. Justice DAVIS, dissenting.

The question is, whether the statement of the plaintiff, in his conversation with Miles Murphy, that he had placed the pork in the hands of Allen, that it was sent to Chicago, and that he was out of pocket some $8000 or $10,000, under the circumstances mentioned, was admissible?

It occurred in a conversation with a person to whom B. F. Murphy, one of the defendants, had sent the plaintiff to endeavor to obtain from him the proceeds of the pork. Now, this conversation was competent evidence as against B. F. Murphy as it respects the business upon which the plaintiff had been sent; he, B. F. Murphy, had accredited Miles Murphy to speak for him in respect to the transaction, and so far as it might tend to prove the partnership of B. F. Murphy with Allen, competent and pertinent. We agree it was no evidence against Allen, nor does it appear that the court gave it any effect as to him. It is not required that, in proving a partnership, the evidence must be competent as it respects each member of the firm. The proof can be given as bearing separately against each of the parties. Miles Murphy, in response to the mission of the plaintiff, stated that B. F. Murphy was a partner of Allen, and that the firm had received and sold the pork. As this response was competent testimony against B. F. Murphy, it was properly admitted. The whole conversation that occurred, or which related to the business about which the plaintiff was sent, was properly allowed. It was no evidence as against Allen, as we have already said, but was as it respected the other defendant. On this ground we cannot agree to the opinion of the court.